HERNÁNDEZ, District Judge:
Magistrate Judge Sullivan issued a Findings & Recommendation (# 89) on August 27, 2018, in which she recommends the Court grant in part and deny in part the parties' motions for summary judgment, vacate the Forest Service's decision, and remand for further proceedings. Central Oregon Landwatch, Federal Defendants, and Intervenors have all filed timely filed objections to the Findings & Recommendation. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).
When any party objects to any portion of the Magistrate Judge's Findings & Recommendation, the district court must make a de novo determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1) ; Dawson v. Marshall , 561 F.3d 930, 932 (9th Cir. 2009) ; United States v. Reyna-Tapia , 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).
I have carefully considered all of the objections and the responses to the objections. Other than as specifically addressed below, I conclude there is no basis to modify the Findings & Recommendation. I have also reviewed the pertinent portions of the record de novo and find no other errors in the Magistrate Judge's Findings & Recommendation.
I. Gray Wolves
For the reasons explained by Judge Sullivan, I adopt her conclusions that the Forest Service's "No Effect" determination violated the ESA and NEPA. I clarify, *1221 however, that upon remand, the agency must properly consult with the FWS under 50 C.F.R. §§ 402.13, 402.14, meaning that it must comply with the ESA consultation requirement by formally consulting under § 402.14(a)unless it is excepted from formal consultation by meeting the requirements set forth in § 402.14(b) and § 402.13.
II. Elk Habitat
For the reasons explained by Judge Sullivan, I adopt her conclusions that the Forest Service violated NFMA and NEPA in regard to the elk habitat claims. In their objections, the Federal Defendants argue that Judge Sullivan exceeded the scope of her authority under the APA by ordering the Forest Service to map calving sites and wallows upon remand. I do not read the F & R in quite the same way. In assessing whether the Forest Service complied with the Forest Plan's requirements regarding protection of elk calving sites and wallows, Judge Sullivan explained that the while the SFEIS contained some seasonal restrictions applicable to known sites, the SFEIS and ROD failed to identify where known calving sites and wallows are located or how they relate to the Project open routes. F & R at 20. She also noted the absence of maps or otherwise documented locations of specific elk wallows to which timing restrictions would apply. Id. ; see also id. at 21 (noting that the SFEIS and ROD do not identify where known wallows are located or how they are located in relation to Project open routes).
Judge Sullivan acknowledged Defendants' argument that the Forest Service is entitled to deference regarding how to meet its obligations to minimize disturbances and to protect calving sites and wallows. Id. at 21 (further acknowledging the argument that the Forest Plan does not contain specific mandates on how the Forest Service must minimize disturbance and does not impose specific seasonal use restrictions). She explained however, that the issue was not one of scientific interpretation or judgment to which agency deference would apply. Id. Instead, she found that without data identifying the location of the sites, the Forest Service could not meets its obligation to protect the sites or minimize disturbance to them. Id.
As I understand her reasoning, Judge Sullivan found that without data regarding the location of elk calving sites and wallows, the Forest Service failed to offer a rational explanation for how the Project meets the Forest Plan's requirement to protect those sites and minimize disturbances. While I agree with Judge Sullivan that without more specific information regarding the locations of the sites in relation to the Project's proposed designated routes, the Forest Service fails to sufficiently explain how it protects the sites and minimizes disturbances to them, I do not read the F & R as requiring actual mapping of the sites. It may be that such mapping is the best way to provide the missing explanation but there is no specific directive in the F & R that the agency must produce maps. The problem with the SFEIS and the ROD is the failure of a rational explanation showing how the Forest Service is complying with these particular Forest Plan directives. How the Forest Service chooses to remedy this error is not something the F & R expressly dictates.
III. Riparian Claims
For the reasons explained by Judge Sullivan, I adopt her conclusions regarding the riparian claims under NFMA and NEPA with one exception: I disagree with her finding that the Forest Service properly supported its modification of INFISH RMOs.
*1222 The Forest Service modified INFISH RMOs for woody debris, stream temperature, and width/depth ratios. Judge Sullivan agreed with the Forest Service that it provided sufficient justification for those modifications. F & R at 41-42. She explained that the Forest Service analyzed habitat indicators and used specific criteria to determine how well each indicator functioned in the watersheds. Id. at 42 (citing AR 25355-64). The indicators were water quality, including stream temperatures and sediment/turbidity, habitat access including physical barriers to fish passage, and habitat elements including large woody material, pool frequency and quality, and channel width/depth ratios. Id. She explained that the Forest Service analyzed the RMOs for stream temperature based on references concerning the size of, and average temperatures of, streams where redband trout are typically found and the average maximum temperatures suitable for spawning. Id. (citing AR 25355-57). The agency modified the width/depth ratio RMO by adopting a more nuanced stream system. Id. (citing AR 25356-61; Supp'l AR 942). Judge Sullivan concluded that these studies provided specific data for the Forest Service, applying its expertise, to modify the RMOs under "the deferential standard." Id.
I agree with Judge Sullivan that the Forest Service analyzed various habitat indicators and cited to certain studies in support of the RMO modifications. If INFISH did not have more specific modification requirements, I would agree with Judge Sullivan that the agency's conclusions were supported under the deferential standard. But, I agree with Central Oregon Landwatch that INFISH mandates specific watershed or stream reach specific data supporting the change to an INFISH RMO. Because that did not occur here, the SFEIS does not comply with INFISH.
INFISH created interim RMOs[1] which are subject to modification, but only after certain prerequisites have been met. At the time they were adopted in 1995, the interim RMOs were "considered to be the best watershed scale information available.[.]" AR 2564. INFISH recognized that specific watershed or stream reach conditions based on local geology, topography, climate, and potential vegetation should be considered in refining RMOs. Id. It encouraged Forest Service managers "to establish site-specific RMO's through watershed analysis or site specific analysis." Id. INFISH requires the "completion of watershed analysis" before establishing non-interim, site-specific RMOs. Id. In lieu of that analysis, it also allows modification of an interim RMO in the "absence of watershed analysis where watershed or stream reach specific data support the change." Id. Thus, as I read the INFISH requirements, a Forest Service manager may replace INFISH interim RMOs with site-specific non-interim RMOs only after "completion of watershed analysis" and may modify INFISH interim RMOs for particular projects in the absence of watershed analysis only where "watershed or stream reach specific data support the change."
The SFEIS cites the interim INFISH RMOs which are relevant to the Project and redband trout. AR 25351-52 (water temperature, bank stability, large woody debris, pool frequency). In modifying the INFISH RMOs for large woody debris, stream temperature, and width/depth ratios, *1223 the Forest Service explained that the modified RMOs described the habitat in the Project Area better than INFISH. AR 25351 (RMOs varied from INFISH based on studies "for RMOs [that] better describe the habitat in the project area than INFISH"); AR 26028 (acknowledging INFISH RMOs but noting that other RMOs "have been better defined for the project area").
As to large woody debris, the Forest Service modified the INFISH RMO (more than 20 pieces per mile of woody debris that is greater than 12 inches in diameter and 35 feet long), AR 2566, to one that provided for debris of the same diameter and length but increased the frequency to more than 48 pieces per mile in class IV streams and more than 69 pieces per mile in other streams. AR 25356. The SFEIS explained that this change was based on a 1995 study addressing "[r]eference conditions" for large woody debris documented in Oregon's Blue Mountains, which the SFEIS described as a "physiographic province more similar to the watersheds within the [Project] area." AR 25359.
As for stream temperature, the INFISH RMO provides for no measurable increase in maximum water temperature, with a maximum water temperature below 59°F within adult holding habitat and below 48°F within spawning and rearing habitats. AR 25352. The SFEIS explained that "[r]edband trout have been found to typically be present in small- to medium-sized streams between 50°F (10°C) and 61°F (16°C), [and] outside of this range they are less likely to be present (Meyer et al 2010)." AR 25357. The Forest Service considered that the "state of Oregon assumes that waters" with a "seven-day average maximum temperature" that does not exceed 18.0°C (64.4°F) "will provide water temperatures suitable for redband trout spawning." Id. Based on this information, the agency used RMOs that classified stream temperature as "Good" if its seven-day-average maximum temperature was between 10°C (50F) and 14°C (57°F), as "Fair," if it was between 14°C (57°F) and 18°C (64°F), and "Poor" if it was greater than 18°C (64°F). AR 25355, AR 25357.
As to width/depth ratios, the INFISH RMO has a width/depth ratio objective of less than ten for all stream systems regardless of specific characteristics. AR 2566. The Forest Service modified the RMO based on a study by Rosgen that identified width/depth ratios based on the type of stream. AR 25356, 2536; Supp'l AR 942.
The Forest Service's explanations for its modifications to the INFISH interim RMOs do not cite to "watershed or stream reach specific data support[ing] the change." Instead, the Forest Service cites to a study conducted in the Blue Mountains (large, woody debris), information based on state standards for streams identified as having salmon and trout rearing and migration (stream temperature), and a 1996 "Applied River Morphology" study which provided width/depth ratios based on stream type (width/depth ratio). None of these references and studies appear to have relied on data from watersheds or specific stream reaches in the Ochoco National Forest. Because such data is unambiguously required by INFISH before modification to an RMO may occur, the SFEIS violates INFISH. Accordingly, I decline to adopt the portion of the F & R which found that the Forest Service complied with INFISH requirements in modifying RMOs.
CONCLUSION
Other than the clarifications provided above regarding the claims related to gray wolves and elk habitat, and other than the INFISH RMO modification claim, I adopt *1224 all of the F & R's other findings and recommended conclusions. Thus, the Court ADOPTS Magistrate Judge Sullivan's Findings & Recommendation [89] in part, and therefore, the parties' motions for summary judgment [48, 57, 58, 69] are granted in part and denied in part as explained in the F & R and as modified herein. The Forest Service's SFEIS and ROD at issue in these consolidated cases are vacated and remanded to the Forest Service for further proceedings consistent with the F & R and as modified herein.
IT IS SO ORDERED.
FINDINGS AND RECOMMENDATIONS
SULLIVAN, United States Magistrate Judge:
In the above-captioned, consolidated cases, plaintiffs challenge the U.S. Forest Service's ("Forest Service") approval of the Ochoco Summit Trail System Project (the "Project") in the Ochoco National Forest (the "Forest"). The Project provides for a 137-mile network of roads and trails for off-highway vehicle ("OHV") use. The Forest Service approved the Project by a Supplemental Final Environmental Impact Statement ("SFEIS") in September 2016, and the Forest Supervisor issued a final Record of Decision ("ROD") in June 2017.
Plaintiffs are WildEarth Guardians, Oregon Wild, the Sierra Club, and Great Old Broads for Wilderness (together, "Guardians"); Central Oregon LandWatch ("LandWatch"), and Oregon Hunters Association (the "Hunters"). Defendants are the Forest Service; Shane Jeffries,[1] Forest Supervisor; and James M. Peña, Regional Forester (collectively, "federal defendants"). Ochoco Trail Riders, Oregon Motorcycle Riders Association, Pacific Northwest 4 Wheel Drive Association, Deschutes County 4 Wheelers, and the Blueribbon Coalition have intervened as defendant-intervenors. (Docket Nos. 28, 35). The State of Oregon has appeared as amicus curiae. (Docket Nos. 37, 38).
Plaintiffs challenge the SFEIS and ROD under the Administrative Procedure Act, 5 U.S.C. § 704. Plaintiffs bring claims under the following statutes, regulations, and rules:
(1) the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. ;
(2) the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq. , and the Ochoco National Forest Land and Resource Management Plan ("Forest Plan"), AR 1386-1875;
(3) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. ;
(4) the Inland Native Fish Strategy ("INFISH"), AR 2563-80; and
(5) the Travel Management Rule ("TMR"), 70 Fed. Reg. 68,264 (Nov. 9, 2005).
The parties have filed cross-motions for summary judgment. (Docket Nos. 48, 57, 58, 69). Additionally, LandWatch moved to supplement the Administrative Record (Docket No. 52), and amicus moved to submit extra-record evidence (Docket No. 55); defendants oppose both Motions (Docket No. 68). LandWatch then moved to strike the federal defendants' response to its Motion to Supplement. (Docket No. 73).
The Court heard oral argument on the Motions on May 22, 2018. (Docket Nos. 86, 88). At the oral argument, the Court DENIED LandWatch's Motion to Supplement and amicus' Motion to Submit Extra-Record Evidence, and accordingly, DENIED
*1225 as moot LandWatch's Motion to Strike, for the reasons stated at the hearing and herein.
For the following reasons, the Court should GRANT IN PART AND DENY IN PART the Motions for Summary Judgment, as provided below. The Court should VACATE the Forest Service's decision and REMAND for further proceedings.
BACKGROUND
I. The Ochoco Summit Trail System Project
The Ochoco Summit Trail System Project (the "Project") consists of a 137-mile trail system throughout the Ochoco National Forest (the "Forest") designed to provide recreational opportunities for off-highway vehicles ("OHVs"). AR 25226, 28725-26, 28734-47. Thirty of these miles are "connecting high-clearance roads," and the remainder are "appropriately and sustainably located user-created trails," "trails on existing road beds," and newly constructed trails. AR 28734. Eighty-four of the miles are on existing roads, and the other fifty-three are "new" routes not on existing roads. AR 28735. The Project incorporates forty existing stream crossings, and adds thirty-nine new crossings. AR 28743-44. The trail system would be open to OHV use from June 1 through September 30, and year-round for non-motorized use. AR 28736. The trails traverse a 301,580-acre area (the "Project Area") near Prineville, Oregon. AR 25218.
The Project incorporates an "OHV Management Area" to address unauthorized OHV trails that can degrade the environment and cause conflict between motorized and non-motorized recreational users. AR 25262-68, 25303, 25310-11, 28738-39. The Project incorporates project design features and mitigation measures designed to protect forest resources, including streams and riparian areas, and big game, particularly elk. AR 25253-70, 28759-63. The Project includes four segments that pass through three old growth management areas, AR 25252, 25662-64, 28771, and construction of a new trail through scabland, AR 25257, 25664, 28777.
II. Project History and Approval
The Forest Service held public meetings from 2006 to 2009 to gather input on, and discuss changes to, Forest roads and trails. AR 8580. This resulted in a November 2009 scoping notice regarding the need for a designated trail system in the Forest, including a proposed action. AR 8578-8605. The Forest Service proposed an OHV trail system to meet the demand for OHV recreational opportunities and address unauthorized user-created trails. AR 8581-83. The Forest Service issued a draft Environmental Impact Statement ("EIS") for the Project in January 2012, and a final EIS and draft Record of Decision ("ROD") in March 2014. AR 25232. The Forest Service then withdrew the final EIS and draft ROD in July 2014 to permit further Project design. AR 21632. It issued a supplemental draft EIS in February 2016, and a supplemental final EIS ("SFEIS") in September 2016. AR 25203, 25232. Finally, the Forest Supervisor approved the Project in a final ROD on June 27, 2017. AR 28753, 28764.
The SFEIS evaluated five alternative project designs: a "no-action" alternative and four action alternatives. AR 25236, 25252. The Forest Supervisor ultimately adopted the Project, consisting of Alternative 5 with the addition of one route from Alternative 2. AR 28733.
LEGAL STANDARD
Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. , a court "shall" set aside any agency action *1226 that is, inter alia , "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. § 706(2)(A). "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." Marsh v. Or. Nat. Res. Council , 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quotations omitted). "As a reviewing court, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." San Luis & Delta-Mendota Water Auth. v. Jewell , 747 F.3d 581, 601 (9th Cir. 2014) (quotation omitted). "To have not acted in an arbitrary and capricious manner, the agency must present a rational connection between the facts found and the conclusions made." Native Ecosystems Council v. U.S. Forest Serv. , 418 F.3d 953, 960 (9th Cir. 2005) (quotation omitted). "[W]here the agency's reasoning, although complex, is rational, clear, and complete, [the court] must affirm. Contrarily, where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, [the court] must disapprove the agency's action." Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A. , 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (quotation omitted). "Although [the court's] inquiry must be thorough, the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." San Luis & Delta-Mendota Water Auth. , 747 F.3d at 601 (quotation omitted).
"Agency action '[n]ormally' is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "[A]n agency's decision can be upheld only on the basis of the reasoning in that decision." Anaheim Mem'l Hosp. v. Shalala , 130 F.3d 845, 849 (9th Cir. 1997).
ANALYSIS
I. Motions Concerning Evidence and the Administrative Record
LandWatch moved to supplement the Administrative Record with two maps it prepared of elk security habitat in the Project Area. Pl. LandWatch Mot. Supplement (Docket No. 52); Quinlan Decl., Ex. B & C (Docket Nos. 53, 53-2, 53-3). Amicus moved to submit extra-record evidence, specifically, a map it created of gray wolf dispersal paths. Amicus Mot. Submit Extra-Record Evid. (Docket No. 55); Brown Decl., Ex. 1 (Docket Nos. 56, 56-1). Federal defendants opposed these Motions. (Docket No. 68). Along with their Opposition brief, defendants submitted the Passarelli Declaration to support their arguments that the maps that LandWatch and amicus submitted were flawed and improper for the Court to consider. (Docket No. 68-1). LandWatch, in turn, moved to strike the Passarelli Declaration. (Docket No. 73).
For the reasons stated at oral argument, and for the reasons that follow, the Court DENIED LandWatch's Motion to Supplement and amicus' Motion to Submit Extra-Record Evidence, and accordingly, DENIED as moot LandWatch's Motion to Strike.
A. Consideration of Extra-Record Evidence under the Administrative Procedure Act
Courts reviewing an agency decision are limited to the administrative *1227 record. Fla. Power & Light Co. v. Lorion , 470 U.S. 729, 743-44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." Sw. Ctr. for Biological Diversity v. U.S. Forest Serv. , 100 F.3d 1443, 1450 (9th Cir. 1996). There are "narrow exceptions" to this rule, in "limited circumstances." Lands Council v. Powell , 395 F.3d 1019, 1030 (2005) :
[D]istrict courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.
Id. (quotations omitted). "These limited exceptions operate to identify and plug holes in the administrative record.... [T]hese exceptions are narrowly construed and applied." Id. "[T]he party seeking to admit extra-record evidence initially bears the burden of demonstrating that a relevant exception applies." San Luis & Delta-Mendota Water Auth. v. Locke , 776 F.3d 971, 993 (2014).
B. Consideration of Extra-Record Evidence under the Endangered Species Act
Unlike APA review, review under the Endangered Species Act ("ESA") is not limited to the administrative record. W. Watersheds Project v. Kraayenbrink , 632 F.3d 472, 497 (9th Cir. 2011) (holding that a court "may consider evidence outside the administrative record for the limited purposes of reviewing [an] ESA claim"). While the APA's standard of review applies to ESA citizen suits, the APA does not limit the scope of review. Id. at 481 ; Wash. Toxics Coal. v. E.P.A. , 413 F.3d 1024, 1034 (9th Cir. 2005), abrogated on other grounds as recognized by Cottonwood Envtl. Law Center v. U.S. Forest Service , 789 F.3d 1075 (9th Cir. 2015).
C. LandWatch's Motion to Supplement
LandWatch's maps do not satisfy the strict APA requirements for supplementation of the Administrative Record. The maps were created after the administrative process, specifically for this litigation, and first presented before this Court. The Lands Council "exceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information." Tri-Valley CAREs v. U.S. Dep't of Energy , 671 F.3d 1113, 1130 (9th Cir. 2012) (alteration and quotation omitted). LandWatch's submissions constitute attempts to provide its own presentation of the facts regarding vegetation management projects and "actual habitat conditions" of the elk security habitat, to try to persuade the Court that the Forest Service's decision was incorrect. Additionally, LandWatch's materials are not of a complexity that requires additional explanation for the Court. See Inland Empire Pub. Lands Council v. Glickman , 88 F.3d 697, 704 (9th Cir. 1996), as amended (July 15, 1996).
For purposes of ESA review, LandWatch has not demonstrated that the proffered maps are relevant to the parties' ESA claims, or that they would contribute to the Court's analysis or decisionmaking, beyond what is already before the Court in the Administrative Record. LandWatch's argues that the Forest Service's determination *1228 that the Project would have "no effect" on endangered gray wolves is flawed in part because the Project would affect elk, the wolves' primary prey. See AR 25479. However, the Record already indicates that, and the Forest Service has considered that, the Project would impact elk habitat and distribution, and this indicates potential effects on gray wolves via effects on their prey. Maps overlaying the Project Area, elk security habitats, vegetation management activities, and other special habitat types, as proffered by LandWatch, do not contribute to, inform, or alter this analysis. Although elk, their habitats, and the Project's effects on those habitats are relevant to the parties' ESA claims regarding gray wolves, the specific subject matter of these maps is not. LandWatch's proposed submissions are not proper supplements to the Administrative Record.
D. Amicus' Motion to Submit Extra-Record Evidence
Amicus' Motion to Submit Extra-Record Evidence is improper. Amicus' role is "assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." Miller-Wohl Co. v. Comm'r of Labor & Indus. State of Mont. , 694 F.2d 203, 204 (9th Cir. 1982). "An amicus curiae is not a party to litigation," and courts "rarely give[ ] party prerogatives to those not formal parties"; "[a] petition to intervene and its express or tacit grant are prerequisites to that treatment." Id. at 204. Amicus has not moved to intervene and does not have the prerogatives of a proper party in this action, such as filing a motion to consider extra-record evidence. See also United States v. Oregon , 745 F.2d 550, 553 (9th Cir. 1984) (noting "obvious distinctions between parties and amici").[2]
Even if amicus were permitted to move to submit extra-record evidence, the proffered map evidence would not be admissible. For the same reasons that LandWatch's maps do not fall within the Lands Council exceptions, amicus' map is not admissible under the APA. It was created after the administrative process and was not before the agency. It does not demonstrate, beyond what the Administrative Record already contains, how the Forest Service purportedly failed to consider the Project's impacts on gray wolves, and it does not explain terms or subject matter too technical or complex for the Court to otherwise understand. As for the ESA, the proffered map does not contribute to the Administrative Record as is relevant to the Court's analysis. The parties' ESA arguments simply rely on the fact that wolves disperse through the Project Area, which the Administrative Record already indicates. Amicus' proposed submission is not properly considered as extra-record evidence.[3]
*1229 E. LandWatch's Motion to Strike
Federal defendants have submitted the Passarelli Declaration (Docket No. 68-1) in support of their argument that LandWatch's and amicus' proffered maps are scientifically flawed, are not properly considered as extra-record evidence or supplements to the Administrative Record, and do not support the substantive arguments in support of which those parties seek to submit them. The Passarelli Declaration, therefore, is not submitted in support of federal defendants' arguments on the merits or the substance of the parties' Motions for Summary Judgment. It is thus fundamentally different from LandWatch's and amicus' proposed submissions. Because it is not presented for purposes of adjudicating the parties' claims under the APA or the ESA, the above-described standards do not govern the Passarelli Declaration's admissibility. Rather, the question is whether the Declaration is relevant and admissible for these limited evidentiary purposes under generally applicable rules of evidence.
Nonetheless, the Court has determined that LandWatch's and amicus' proffered evidence is not properly admitted, and the Court's determination thereon does not rely on the Passarelli Declaration. Thus, LandWatch's Motion to Strike the Passarelli Declaration is moot.
* * *
For these reasons, the Court DENIES plaintiff LandWatch's Motion to Supplement the Administrative Record (Docket No. 52) and amicus' Motion to Submit Extra-Record Evidence (Docket No. 55). LandWatch's Motion to Strike (Docket No. 73) is DENIED as moot.
II. Standing
Each plaintiff has established standing to bring each of its claims.
"To establish standing, a plaintiff must show that (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." WildEarth Guardians v. U.S. Dep't of Agric. , 795 F.3d 1148, 1154 (9th Cir. 2015) (quotation omitted). An organization or association
has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
Or. Advocacy Ctr. v. Mink , 322 F.3d 1101, 1109 (9th Cir. 2003) (quotation omitted). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Rumsfeld v. Forum for Acad. & Inst. Rights, Inc. , 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc. , 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quotation omitted).
Federal defendants challenge standing only as to LandWatch's ESA claims. See Fed. Def. MSJ, at 74 n.34 (Docket No. 69). However, Guardians also bring identical, if not broader, claims regarding the gray wolf, under both the ESA and NEPA, and defendants have not challenged Guardians' standing. The ESA claims are thus properly before this Court. Defendants argue *1230 that, although LandWatch's declarants testify to a general interest in Forest wildlife, the declarations are insufficiently specific regarding wolves. Regardless of whether the initial declarations were sufficient as to wolves and the ESA, LandWatch has submitted the supplemental Miller Declaration, which specifically demonstrates an interest in witnessing and photographing wolves in the Project Area, which is sufficiently specific to establish standing. See Miller Suppl. Decl. ¶¶ 6-7 (Docket No. 77-1); Friends of the Earth , 528 U.S. at 183, 120 S.Ct. 693. Federal defendants' arguments against LandWatch's standing are unsuccessful.
III. The Endangered Species Act and Gray Wolves
A. The Endangered Species Act
"The purposes of" the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. ,"are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species ...." It is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species ...." 16 U.S.C. §§ 1531(b) - (c)(1).
ESA Section 7 consultation requires each federal agency to "insure that any [agency] action ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species ...." Id. § 1536(a)(2). "Only after [an agency] complies with § 7(a)(2) can any activity that may affect the protected [species] go forward." Pac. Rivers Council v. Thomas , 30 F.3d 1050, 1056-57 (9th Cir. 1994). "Congress' intent" under Section 7 was "to give the benefit of the doubt to the species." Conner v. Burford , 848 F.2d 1441, 1454 (9th Cir. 1988) (quotation omitted).
The first step under Section 7 is to determine whether any listed or proposed to be listed species may be present in the area of the proposed action. 16 U.S.C. § 1536(c)(1) ; 50 C.F.R. § 402.12(c). If such a species may be present, the agency must prepare a biological assessment to determine if the proposed action may affect a listed species. 16 U.S.C. § 1536(c)(1). If the agency determines that its actions "may affect" a listed species or critical habitat, the agency must engage in formal consultation under Section 7(b) of the ESA with either the Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service. Kraayenbrink , 632 F.3d at 496 ; 50 C.F.R. §§ 402.01, 402.14(a) - (b). "The minimum threshold for an agency action to trigger consultation with FWS is low ...." Kraayenbrink , 632 F.3d at 496. "[A]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." Id. (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ). If the agency determines that its action will have "no effect" on a listed species or critical habitat, the agency has no further ESA obligations. Pac. Rivers Council , 30 F.3d at 1054 n.8.
B. Gray Wolves and the Project
The Forest Service concluded the Project would have "No Effect" ("NE") on the gray wolf. AR 25479. It reached this conclusion based on a finding that there were no breeding packs in the Forest, and because no wolves were known to consistently occupy the Project Area. Id. The Forest Service's conclusion, however, is erroneous. The inquiry under the "may be present" step of the Section 7 *1231 consultation analysis is not whether a given species may be present in great enough numbers to constitute a breeding pack, or by specific individuals consistently occupying an area, but whether the species "may" be "present." The Administrative Record contains numerous references to gray wolves' presence in the Forest. Data shows "marked increase" in use of the Forest by gray wolves, with expanding distribution including movement through the Forest. AR 27023, 27041. Guardians noted "reputable reports" of wolf observations in the Forest. Id. Forest Service staff and contractors also made wolf observation reports. AR 24986, 25149-51. Location data from wolves with radio collars show gray wolves traveling through the Project Area. AR 23788, 25479. The Forest Service noted that the Project Area contains "Dispersal/Transient" habitat for gray wolves, and that the wolf is "likely to occupy" the Project Area. AR 25477-78.
Defendants rely on Defenders of Wildlife v. Flowers , 414 F.3d 1066 (9th Cir. 2005), to argue that residency is required before there can be any effects to a species under Section 7. Flowers does not so hold, and the facts of that case are inapposite. In Flowers , no pygmy owl (the species in question) had ever been detected in the project area, and only in one older survey had a pygmy owl been found near the area. This is unlike the situation here, where wolves are known to be present in the Forest on occasion, and in the Project Area specifically.
Given this erroneous basis for a negative finding at the "may be present" step of the Section 7 analysis, the Forest Service must reevaluate whether the Project "may affect" the gray wolf. This is especially so given the "low" threshold for the "may affect" analysis, which considers "any possible effect." Kraayenbrink , 632 F.3d at 496. Such effects are strongly suggested by defendants' admissions that roads and motorized routes can affect wolves by reducing available prey (such as elk and deer) and by decreasing the suitability of habitat, and that wolves avoid areas with motorized vehicle activity and concentrated human activities. Answer to Am. Compl. ¶ 105 (Docket No. 27); Answer to Am. Compl. ¶ 58 (Docket No. 32).[4] The Administrative Record also notes potential impacts to wolves and their prey from wolves' use of Project Area land for denning, foraging, and dispersing; from shifting from public to private lands; from changing prey distributions; from conflict with humans; and from increased road densities and traffic. AR 26743-44. To the extent gray wolves "may be present" in the Project Area, the "may affect" analysis must address these considerations.
Defendants argue that, while they were not required to do so, they obtained the endorsement of FWS through emails and informal communications. This is not enough given that it is undisputed that the gray wolves may be present in the Project area. The Forest Service must conduct a formal consultation with the appropriate agencies regarding the effects on an endangered species. 50 C.F.R. §§ 402.13, 402.14
The Forest Service's determination at the "may be present" stage of the Section 7 consultation inquiry, and thus its "no effect" determination, violated the ESA. For these same reasons, the Forest Service failed to take a "hard look" at the Project's effects on gray wolves, in violation *1232 of the National Environmental Policy Act. LandWatch's and Guardians' Motions for Summary Judgment should be granted as to their ESA gray wolves claim, and defendant's Motion should be denied.
IV. Elk Habitat Claims under NFMA and NEPA
Each plaintiff brings claims regarding the Project's impacts on elk and elk habitat under the National Forest Management Act ("NFMA") and National Environmental Policy Act ("NEPA"). The claims concern protection of elk calving areas and wallows,[5] the protection of elk habitat, the scientific integrity of the studies on which the Forest Service made decisions regarding habitat, and the cumulative impacts of the Project with other Project Area actions.
A. The National Forest Management Act
"The NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." Native Ecosystems Council v. Weldon , 697 F.3d 1043, 1056 (9th Cir. 2012) (citing 16 U.S.C. § 1604 ). First, the Forest Service develops a Land and Resource Management Plan (a "forest plan"), containing "broad, long-term plans and objectives for the entire forest." Id. It then implements the forest plan through site-specific projects." Id. The NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands" be consistent with the forest plan. 16 U.S.C. § 1604(i).
"Procedurally, all management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the NFMA." Native Ecosystems Council v. Tidwell , 599 F.3d 926, 932 (9th Cir. 2010) (quotation omitted).
Substantively, the NFMA also places a duty on the Forest Service to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area ...." 16 U.S.C. § 1604(g)(3)(B). In order to ensure compliance with the forest plan and the NFMA, the Forest Service must conduct an analysis of each "site specific" action, such as a timber sale, to ensure that the action is consistent with the forest plan.
Id. (quotation omitted). "Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components ...." 36 C.F.R. § 219.15(d).
Land and resource management plans must "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 [ 16 U.S.C. §§ 528 - 531 ], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e). The Forest Service has broad discretion to determine how to balance these uses to "best meet the needs of the American people." Id. § 531(a).
"While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference."
*1233 Weldon , 697 F.3d at 1056 ; see also Ecology Ctr. v. Castaneda , 574 F.3d 652, 661 (9th Cir. 2009).
B. The National Environmental Policy Act
"NEPA declares a broad national commitment to protecting and promoting environmental quality." Robertson v. Methow Valley Citizens Council , 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (citing NEPA § 101, 42 U.S.C. § 4331 ). Its purpose is "action-forcing":
It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.
Id. at 349, 109 S.Ct. 1835. "[T]he task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt. , 387 F.3d 989, 993 (9th Cir. 2004). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." Robertson , 490 U.S. at 350, 109 S.Ct. 1835.
If proposed agency action "may have a significant effect on the environment," the agency must prepare an "Environmental Impact Statement" ("EIS"), which provides a "detailed" analysis. Blue Mountains Biodiversity Project v. Blackwood , 161 F.3d 1208, 1212 (9th Cir. 1998) (italics added, quotation omitted); 42 U.S.C. § 4332(2)(C) ; 40 C.F.R. §§ 1501.4, 1508.11. Alternately, regulations permit agencies to prepare "a more limited document," an "Environmental Assessment" ("EA"), which is a " 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].' " Jones v. Nat'l Marine Fisheries Serv. , 741 F.3d 989, 997 (9th Cir. 2013) (alterations in original) (quoting 40 C.F.R. § 1508.9(a) ).
"Taking a 'hard look' includes considering all foreseeable direct and indirect impacts." Ctr. for Biological Diversity v. Salazar , 695 F.3d 893, 916-17 (9th Cir. 2012) (quotation omitted). "Direct" effects (i.e., impacts) "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). "Indirect" effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," including "effects on air and water and other natural systems, including ecosystems." Id. § 1508.8(b). "Cumulative" effects include "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions ... [and] can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. The agency must disclose the direct, indirect, and cumulative impacts and consequences of its actions. 40 C.F.R. §§ 1502.16(a) & (b), 1508.25(c), 1508.27(b)(7). The failure to disclose or analyze this information means that the agency has failed to take a "hard look" at environmental consequences. Klamath-Siskiyou Wildlands Ctr. , 387 F.3d at 994-96.
C. Protection of Elk under NFMA and the Forest Plan
1. Calving and Wallows
The Forest Plan's Forest-Wide Standards and Guidelines require the Forest Service to protect elk in two regards:
"(1) Protect the character of elk calving sites. Minimize disturbance from human *1234 activity during calving seasons (approximately May 15 to June 30)."
"(2) Also protect wallows during rutting season (September 1 to October 15)." AR 1670.[6] Plaintiffs contend that the Project violates these requirements by authorizing motor vehicle use on routes through calving sites and wallows during the relevant seasons. Motorized OHV use is permitted from June 1 through September 30. AR 28734, 28737. The Project imposes seasonal timing restrictions on "project construction, re-construction, decommissioning and maintenance activities" from May 15 through June 30 in elk calving areas, and from September 1 through October 15 within .25 miles of elk wallows. AR 25260, 28759. While defendants argue that these timing restrictions were meant to apply to motorized OHV use during the relevant calving and rutting seasons, the record does not reflect defendants' claim.
In addition, the restrictions are insufficient to protect the sites as required by the Forest Plan. These restrictions apply only to known sites. AR 28759-60. The SFEIS and ROD do not identify where known calving sites and wallows are located or how they relate to Project open routes (although the SFEIS does provide some quantification of elk calving sites and discussion of potential calving sites). There are no maps or otherwise documented locations of specific elk wallows to which timing restrictions would apply. As indicated, there are no seasonal motorized use restrictions on routes passing through or near calving sites and wallows because the Project allows motorized vehicle use from June 1 to September 30. AR 28736.
Regarding calving sites, the Forest Service mapped fawning sites and found that the Project would designate sixty-nine miles of OHV trails through calving sites. AR 25528-29. This could "impact habitat in potential elk calving areas by 11,040 acres," or 9% of total elk calving acres in the Project Area. AR 25529. The SFEIS acknowledges that June is a "critical time period[ ]" for calving. AR 25519. With regard to wallows, the Forest Service considers elk wallows "fragile areas" deserving of extra consideration and protection under the Forest Plan. AR 1284, 25534. Elk are particularly vulnerable during these reproductive and breeding periods. AR 26928. However, the SFEIS and ROD do not identify where known wallows are located or how they are located in relation to Project open routes. The SFEIS does not explain how or why allowing motor vehicle use on routes through calving sites and wallows during the relevant seasons protects calving sites and wallows. The Administrative Record contains numerous studies and comments regarding the adverse effects of motor vehicle use on elk, especially during calving and rutting seasons. See, e.g. , AR 3598-99, 6289, 25528, 26743, 26927-28; SR 120 (Rowland (2000) ), 429 (Wisdom (2005) ). Further, the provisions for future monitoring and mitigation of disturbance to these sites, see AR 28782-83, which have not been prepared or funded, are not sufficient to meet Forest Plan requirements. The duty to demonstrate Forest Plan consistency applies at the time of the decision, not at a speculative future date. Ohio Forestry Ass'n v. Sierra Club , 523 U.S. 726, 729-30, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).
Defendants argue that the Forest Service is entitled to deference regarding how it will meet its obligation to minimize disturbances and protect calving sites and wallows. They argue that the Forest Plan does not contain specific mandates on how *1235 the Forest Service must minimize disturbance and does not impose specific seasonal use restrictions. However, the deficiency in the Project's compliance with the Forest Plan does not lie with agency interpretation of protection or minimization, to which deference could apply. The problem is that, without data identifying the location of calving sites and wallows, the Forest Service cannot meet its obligation to protect those sites or minimize disturbance to them.
Likewise, seasonal restrictions on construction and maintenance, but not on motorized vehicle use, during the seasons the Forest Plan specifically identifies for protection are inconsistent with the Forest Plan and not entitled to deference. Native Ecosystems Council , 418 F.3d at 960 (holding that a court does not defer to an agency interpretation of forest plan where the action is inconsistent with that plan). The motor vehicle use permitted under the Project occurs during sensitive elk seasons, and thus conflicts with and violates the Forest Plan provisions requiring the Forest Service to minimize human activity during calving season and to protect wallows during rutting season. The Forest Service has failed to explain how the Project is consistent with the Forest Plan in this regard. See Neighbors of Cuddy Mountain v. U.S. Forest Serv. , 137 F.3d 1372, 1377 (9th Cir. 1998) (finding NFMA violation where agency provided no information on woodpecker home ranges, despite forest plan requirement to protect a certain amount of old growth within home ranges). This is arbitrary and capricious, and violates the NFMA. Each plaintiff's Motion for Summary Judgment should be granted as to their elk calving site and wallows claims, and defendant's Motion should be denied.
2. Road Density
Guardians and Hunters argue that the SFEIS fails to comply with Forest Plan road density standards. These standards are important for the protection of big game habitat. AR 25511. The Forest Plan requires that open road densities in the Project Area remain below 3.0 miles per square mile ("mi/mi[2]"). AR 1683. Hunters argue that the SFEIS and ROD fail to adequately explain how the Project will meet this road density requirement, thus violating the Forest Plan and the NFMA, and NEPA. The Forest Plan also requires that roads and trails "be at the lowest density which meets long-term resource needs." AR 1648. Guardians argue that the SFEIS and ROD fail to address this requirement.
First, defendants argue that Hunters waived their road density arguments by not raising the issue during the administrative process. However, Hunters made objections regarding the number of Project new road miles, Project Area, and road density requirements multiple times during the administrative process. See, e.g. , AR 8686-87, 15635, 17573-75, 23865-69, 23964-65, 26327, 26347-48. The Forest Service was aware of these objections and even addressed them in its responses. See, e.g. , AR 28157-59, 28120, 28122. It was not required, within the issue of road density requirement compliance, for Hunters to have specifically raised the precise legal argument that it forwards in litigation. The administrative exhaustion requirement is "interpreted broadly." Nat'l Parks & Conservation Ass'n v. B.L.M. , 606 F.3d 1058, 1065 (9th Cir. 2010). An issue must simply be raised "with sufficient clarity to allow the decision maker to understand and rule on the issue raised." Id. Alerting an agency in general terms is enough to satisfy the exhaustion requirement, as long as the agency has been given "a chance to bring its expertise to bear to resolve [the] claim."
*1236 Lands Council v. McNair , 629 F.3d 1070, 1075 (9th Cir. 2010) (alteration in original); see also Native Ecosystems Council v. Dombeck , 304 F.3d 886, 899 (9th Cir. 2002). There is no need to cite the relevant statute or regulation to exhaust a legal issue, nor does a plaintiff need to invoke the exact legal terms of art drawn from those statutory authorities. Or. Nat. Desert Ass'n v. McDaniel , 751 F.Supp.2d 1151, 1161 (D. Or. 2011). Hunters did not waive arguments pertaining to road density.
The SFEIS states that the motorized road density (roads plus trails) for the Project chosen alternative is 2.06 mi/mi[2]. AR 25518. However, the SFEIS contains inconsistent road mileage calculations and figures. Under the "no-action" alternative, the Forest Service concluded that the existing road density was 1.83 mi/mi[2], given 862 miles of existing and open roads and motorized trails in the Project Area. Id.[7] This is repeated at AR 25283.[8] However, the same page of the SFEIS provides data that would yield a much higher total of 1,069 miles of open roads: 659 miles of operational maintenance level 2 roads, 140 miles of highway-legal only roads (maintenance level 3 to 5), and 270 miles of "unclassified or other jurisdiction" roads. AR 25518-19. Table 8 in the SFEIS Transportation Section repeats 1,069 miles of existing open road. AR 25283. Given that the Project adds 107 miles of open motorized routes, AR 28734, this yields a higher road density of 2.49 mi/mi[2].[9] Further, the SFEIS states that there are nearly 700 miles of user-created OHV routes, including open and closed roads, in the Project Area. AR 25284. The SFEIS calculations of road density did not include user-created motorized trails. Id. The SFEIS suggests that "some" user-created trails are "anticipated" to be closed and rehabilitated, but does not indicate when or how this would occur. AR 25532, 25540, 25567-70. The SFEIS does not explain why user-created trails were excluded from the road density analysis. Presumably, elk are unable to distinguish between user-created and Forest-Service-created motorized routes, especially given that open road density is one of the main factors influencing the effectiveness of big game habitat. AR 1676. Adding in 700 miles of user-created roads raises the road density to 3.75 mi/mi[2], well above Forest Plan limitations.[10]
Moreover, the SFEIS elsewhere states that there are 1,820 miles of open road in the Project Area. AR 25280, 25343. The derivation of this number is unclear, as is how many of these miles could have been excluded from the road density calculations, or why. It appears that the Forest Service may have used the larger 1,820-mile figure when it analyzed certain of the Project's impacts in order to minimize their appearance. For example, with regard to Project impact on soils, the SFEIS states that "new trails add only 3 percent to the total 1,820 miles of roads and trails .... Total existing road and trail acreage impacts would be increased by less than 0.014 percent ...." AR 25341. And, "new trails add only 4.6 percent of the total 1,820 miles of road ... in the project area." AR 25345-46. The Forest Service argues that 669 miles of these are closed *1237 roads, and that the road density requirement applies only to open roads. However, this yields (1,820 - 669) 1,151 miles of road, yielding an even higher road density calculation, when added to user-created trails and new Project routes. Further, defendants admit that these closed roads receive unauthorized OHV use, AR 25472, which adds to and repeats the problem of arbitrarily excluding user-created trails from road density calculations.[11]
The Forest Service's provision of these unexplained, significantly different mileage figures, and its omission of user-created trails from road density calculations, was arbitrary and capricious. The use of and conflicting data and calculations undermines the legitimacy and validity of the Forest Service's determinations regarding whether it has complied with the substantive road density requirements. These figures make the SFEIS and ROD internally inconsistent, and arbitrarily and capriciously skew the road density calculations. This also violates the agency's obligation to be accurate and transparent in calculating figures so that the public is provided with quality information, and to ensure that meets Forest Plan requirements. See Native Ecosystems Council , 418 F.3d at 964-65.
In response to plaintiffs' contentions, the Forest Service argues that the agency has discretion in the administrative process regarding the road calculations. Defendants argue that the Forest Service exercised its discretion in choosing which roads to include in the road density analysis. However, there is no explanation or justification for the exclusion of user-created trails. Defendants argue that the Forest Plan does not explicitly require the inclusion of closed or user-created trails in the road density analysis. The question is whether the Forest Service has adequately explained and justified the decision to exclude these trails, which the Forest Service has not done. They argue that the 1,820 mile figure is irrelevant because it is for a "separate analytical purpose," Fed. Def. MSJ, at 43 (Docket No. 69), but do not explain this purpose or why the Forest Service could use different calculations of total mileage to reach conclusions in certain contexts and different conclusions in others. Although the Forest Service has discretion to interpret the Forest Plan, see Weldon , 697 F.3d at 1056, this deference does not extend to decisions that the agency has made without explanation or analysis. The result is that the Forest Service here has acted arbitrarily and capriciously with regard to road density analysis.
Guardians also argue that the Forest Plan requires roads and trails to "be at the lowest density which meets long-term resource needs." AR 1648. The SFEIS and ROD are silent as to the Project's compliance with this requirement, and do not explain what the long-term resource needs are or how the Project meets them. The Forest Service must also provide some analysis that it meets this substantive requirement.
The SFEIS and ROD fail to comply with Forest Plan road density requirements. Hunters' and Guardians' Motions for Summary *1238 Judgment should be granted as to their road density claims, and defendant's Motion should be denied.
D. Protection of Elk under NEPA
Plaintiffs' arguments regarding the protection of elk under the NMFA and the Forest Plan overlap in some regards with their arguments regarding NEPA violations. To the extent that plaintiffs rely on the requirements of NEPA, the Court's analysis follows.
1. Elk Security Habitat
Hunters argue that the Project fails to provide "high quality habitat for elk and deer," as the Forest Plan and NFMA require. See AR 1676. The SFEIS provides that elk security habitat consists of forest land in blocks of 250 acres which are located at least one half mile from open motorized routes. AR 25511, 25533. Hunters object to the Forest Service analysis of elk security habitat in conjunction the road density analysis as explained above. By failing to accurately and consistently analyze the impact of user-created roads on habitat, they argue the Forest Service has failed to take a hard look at these impacts under NEPA.
Hunters also argue that the Forest Service failed to ensure the scientific integrity of the elk security habitat analysis. They argue that the SFEIS inaccurately characterized research and science on elk security habitats from motorized vehicle impacts. Defendants cite to numerous scientific studies to support the SFEIS with regard to elk security habitat.
In formulating an EIS, an agency must "insure the professional integrity, including scientific integrity, of the discussions and analyses." 40 C.F.R. § 1502.24. "This duty require[s] the USFS to disclose its methodologies and scientific sources." Save the Peaks Coal. v. U.S. Forest Serv. , 669 F.3d 1025, 1038 (9th Cir. 2012). The agency must "explain the conclusions it has drawn from its chosen methodology." Lands Council v. McNair , 537 F.3d 981, 994 (9th Cir. 2008), overruled on other grounds , Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The court must defer to scientific judgments and technical analyses within the agency's expertise. Balt. Gas & Elec. Co., v. Natural Res. Def. Council, Inc. , 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Nonetheless, the court must independently review the record and determine whether the agency made a reasoned decision based on its evaluation of the evidence. League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Service , 689 F.3d 1060, 1073 (9th Cir. 2012).
In defining elk security habitat, the SFEIS used certain distance and area criteria as "key indicators" to determine the Project's effects on elk. AR 25511, 25533. In support of these "key indicator" metrics, the SFEIS cited to numerous studies, including Hillis (1991), Rowland (2005), Naylor (2009), ODFW (2008), and Gaines (2003). AR 25513-16. Hunters argue that these studies do not support the key indicator distances used in the SFEIS, and that the SFEIS inaccurately characterizes the studies. Hunters argue that the SFEIS and ROD omit a 30% minimum acreage requirement for elk security areas that Hillis provides; that the SFEIS improperly cites to Rowland for a ½-mile threshold from open road for security habitat; that the Naylor Starkey study does not state that a distance above 1290 meters from open road would not greatly affect elk distribution; that ODFW and Gaines do not support an assumption that the greatest impacts to elk occur within ¼ mile of roadways; and that the Starkey research does not support the decision to *1239 "ignore" closed roads and user-created trails.
In making its findings, the Forest Service did not rely solely on these studies for the findings plaintiffs object to; the Forest Service relied on other studies and other sources of data. An agency is not obligated to adopt the specific findings of any particular study. Kern Co. Farm Bureau v. Allen , 450 F.3d 1072, 1080-81 (9th Cir. 2006). For instance, as to impacts to elk habitat, the SFEIS references and summarizes the findings of several studies in an analysis of habitat effectiveness. AR25512-13 (citing, e.g., Wisdom (2005) and Rowland (2005) ). The Forest Service did not ignore or selectively utilize any of these studies, but used them along with others to perform its analyses. Similarly, regarding the Starkey study, the Forest Service relied on a competing view of distance from open roads and elk distribution from its Wildlife Biologist. When specialists express conflicting views, the agency has the discretion to rely on the reasoned opinions of its own experts, "even if, as an original matter, a court might find contrary views more persuasive." Marsh , 490 U.S. at 378, 109 S.Ct. 1851 ; see also Friends of Endangered Species, Inc. v. Jantzen , 760 F.2d 976, 986 (9th Cir. 1985) (holding that, under NEPA, court not required to resolve disagreements among scientists as to methodology). The Forest Service's reliance on its own expert's findings was reasonable and not arbitrary and capricious as far as that analysis addressed open roads and elk habitat.
The Court is not permitted to substitute plaintiffs' opinions for the agency's scientific judgment. Protect Our Cmtys. Found. v. Jewell , 825 F.3d 571, 583 (9th Cir. 2016). In practice, plaintiffs' arguments seek to impose a requirement that the Forest Service address every argument in every study cited. But this is beyond the agency's NEPA obligations. See Earth Island Inst. v. U.S. Forest Serv. , 697 F.3d 1010, 1021 (9th Cir. 2012) ("Though the Forest Service did not perform the point-by-point type of counter-argument to experts that Plaintiffs appear to desire, our precedent makes clear that an agency need not respond to every single scientific study or comment." (quotations and citation omitted) ).[12]
Regardless of the agency's scientific analysis of distance from open roads, the failure of the Forest Service here is that it did not take a hard look at elk security habitat vis-a-vis open and closed user-created roads. This failure of the Forest Service results in an arbitrary and capricious decision under NEPA. Defendant's Motion for Summary Judgment should be granted as to Hunters' scientific integrity claims, and Hunters' Motion denied; otherwise, each plaintiff's Motion for Summary Judgment should be granted as their to claims concerning elk security habitat and roads, and defendant's Motion denied.
2. Calving and Rutting Areas
LandWatch argues that the Forest Service failed to collect data regarding elk calving and rutting sites. LandWatch contends that the lack of information, as opposed to a disagreement regarding how information is interpreted and applied, as to the current location and distribution of elk calving and rutting sites in the Project Area, violates NEPA. NEPA requires an agency to maintain and disclose adequate baseline data about resources it manages, to allow for evaluation of a project's impacts.
*1240 Neighbors of Cuddy Mountain , 137 F.3d at 1379-80. The Forest Service cannot rely on future monitoring of calving sites and wallows, because data must be available during the EIS process and be available for public comment. See N. Plains Res. Council, Inc. v. Surface Transp. Bd. , 668 F.3d 1067, 1084-85 (9th Cir. 2011).
Defendants argue that the Forest Service has expanded these seasonal protections to include protections from trail use for known elk calving sites and wallows. However, the Project does not incorporate restrictions on trail use , nor does it identify known calving and rutting sites. The ROD and SFEIS language regarding seasonal protections on these sites encompasses only trail construction and maintenance activities, not use. Specifically, the ROD (as revised) reads:
Timing restrictions will be placed on project construction, re-construction, decommissioning and maintenance activities from September 1 through October 15 .... Should any new calving areas be identified along the trail system where the character of the site may be affected due to disturbance, this seasonal restriction would be implemented for these areas in accordance with standards and guidelines outlined in the Forest Plan.
AR 28759-60 (emphasis added). "This" plainly refers to "construction, re-construction, decommissioning and maintenance activities," and does not include use. Defendants argue that the "context" of the Forest Service's responses to objections show that it was the agency's "intention" for the Project to include seasonal restrictions on trail operation, but this was not written into the ROD or SFEIS. Defendants may not, during litigation, attempt to insert the term "trail operation" into the ROD where the Forest Service did not do so.
Regardless of defendants' purported protection of elk calving and rutting sites, it is difficult to determine how the proposed agency action here will have an effect on elk calving and rutting areas if defendants have not adequately identified those areas. Nor have defendants sufficiently articulated how those areas will be protected during the time OHV use overlaps with calving and rutting seasons. The failure to disclose and analyze direct, indirect, and cumulative effects of this information means that defendants have failed to take the "hard look" required under NEPA. Klamath-Siskiyou Wildlands Ctr. , 387 F.3d at 994-96. LandWatch's Motion for Summary Judgment should be granted as to its calving and rutting sites claims, and defendant's Motion should be denied.
3. Cumulative Impacts
Hunters argue that the SFEIS does not sufficiently analyze the Project's cumulative impacts with regard to other actions in the Project Area, specifically, livestock grazing, OHV use on user-created and closed roads, and elk harvest. LandWatch argues that the SFEIS does not consider cumulative impacts of the Project along with such activities as vegetation and fuels management and logging.
NEPA requires that the Forest Service disclose and analyze the direct, indirect, and cumulative impacts and consequences of its actions. 40 C.F.R. §§ 1502.16 & (b), 1508.25(c), 1508.27(b)(7). "Cumulative effects" include "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions ... [and] can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. A cumulative impacts analysis requires "some quantified or detailed information; ... [g]eneral statements about possible effects and some risk do not constitute a *1241 hard look absent a justification regarding why more definitive information could not be provided." Ocean Advocates v. U.S. Army Corps , 361 F.3d 1108, 1128 (9th Cir. 2004), opinion amended , 402 F.3d 846, 868 (2005). This analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects," Kern v. U.S. Bureau of Land Mgmt. , 284 F.3d 1062, 1075 (9th Cir. 2002), and explain how "individual impacts might combine or synergistically interact with each other to affect the ... environment," Klamath-Siskiyou Wildlands Ctr. , 387 F.3d at 997 (quotation omitted). "Courts accord substantial deference to an agency's determination of the scope of its 'cumulative effects' review." Cascadia Wildlands Project v. U.S. Forest Serv. , 386 F.Supp.2d 1149, 1167 (D. Or. 2005).
Hunters contend that the SFEIS fails to sufficiently address cumulative effects of elk harvest. The SFEIS acknowledges effects to deer and elk habitat from "increased legal and illegal harvest." AR 25512. It cites to the Rowland Starkey study regarding direct impacts on elk harvest from road and road traffic. Id. It then discusses effects from legal and illegal harvest at length. AR 25516. It also acknowledges that "increased motorized route densities ... may combine with the effects of fuel and vegetation management projects and may result in an increase in legal and illegal harvest of deer and elk because of more vehicular access and easier visibility due to reduced understory cover." AR 25531. While plaintiff acknowledges that the Forest Service discusses the Project in conjunction with legal and illegal elk harvest, plaintiff does not indicate what other cumulative effects in this regard need be reviewed. The SFEIS adequately reviews cumulative impacts as to elk harvest.
LandWatch contends that the SFEIS fails to consider the cumulative effects of vegetation treatment projects. The SFEIS analyzed the Project's potential cumulative impacts on elk habitat in connection with vegetation treatment in areas overlapping the Project Area. AR 25277, 25531-32. It acknowledged that "potential cumulative impact of disturbance to big game animals" from vegetation management along with disturbance from OHV trail use, but found these changes not sufficiently significant to alter habitat effectiveness. AR 25531-32. This cumulative impacts discussion of habitat effectiveness cites detailed and quantified data. Id. The SFEIS sufficiently analyzes vegetation and fuels management as to elk security habitat.
Hunters contend that livestock grazing occurs in the Project area but that the SFEIS fails to address the cumulative impacts of grazing on elk habitat. Hunters have not provided any studies or rationale for why the Forest Service would have been required to address the cumulative impacts of grazing along with the Project. Hunters cite two mentions in the SFEIS to continued grazing, but this does not amount to a mandate that such grazing be the subject of a cumulative effects analysis. The Forest Service has the discretion to select the appropriate factors for cumulative impact review. See Cascadia Wildlands Project , 386 F.Supp. 2d at 1167.[13]
Plaintiffs argue that OHV use of user-created and closed roads should be included in the cumulative impacts analysis. Defendants argue that the Forest Service adequately considered the effects of such *1242 roads, pointing to this phrase from the SFEIS: "many closed or decommissioned roads that are still receiving motorized use." AR 25532. However, this reference falls far short of the "useful" analysis with "quantified or detailed information" that NEPA requires; it is not even a general conclusion about such effects. Additionally, the Forest Service did not adequately analyze road density with regard to closed and user-generated trails, as discussed. The SFEIS thus does not contain a proper cumulative effects analysis of these closed and user-created roads.
The Forest Service's cumulative impacts analysis was insufficient, and arbitrary and capricious, as to the road density and user-created and closed roads analysis; as to these claims, each plaintiff's Motion for Summary Judgment should be granted, and defendant's Motion denied. The cumulative impacts analysis regarding LandWatch's and Hunters' other claimed deficiencies, however, was sufficient, and as to those issues, defendant's Motion for Summary Judgment should be granted and LandWatch's and Hunters' Motions denied.
V. Riparian Claims: Redband Trout and INFISH
Plaintiffs bring multiple claims regarding the Project's impacts on Project Area watersheds. LandWatch argues that defendants violated NEPA and NFMA with regard to the Redband trout, a species native to the area, by not conducting a proper baseline analysis of sediment impacts, and by violating the Inland Native Fish Strategy. Guardians argue that defendants violated NFMA by failing to protect riparian habitats from recreational impacts.
A. The Inland Native Fish Strategy
In 1995, the Forest Service adopted the Inland Native Fish Strategy ("INFISH") to address the risk of loss of native fish populations and reduce potential negative impacts to fish habitat; INFISH amends the forest plans of twenty-two forests, including the Ochoco Forest Plan, adding substantive standards for fish habitat conditions and function. AR 2546-49. INFISH identifies six Riparian Management Objectives ("RMOs") to assess and define good riparian habitat, i.e., habitat "indicators": (1) pool frequency, (2) water temperature, (3) large woody debris, (4) bank stability, (5) lower bank angle, and (6) width/depth ratio. AR 2564, 2679. RMOs "provide the criteria against which attainment or progress toward attainment of the [INFSH] riparian goals is measured." AR 2564. "RMOs provide the target toward which managers aim as they conduct resource management activities across the landscape." Id. RMOs are "benchmarks against which to measure progress towards ultimate goals." Cent. Or. LandWatch v. Connaughton , 696 F. App'x 816, 818 (9th Cir. 2017). Specifically, INFISH provides for protection of Redband trout in the Project area. AR 25351.
INFISH also establishes Riparian Habitat Conservation Areas ("RHCAs"), which "are portions of watersheds where riparian-dependent resources receive primary emphasis, and management activities are subject to specific standards and guidelines." AR 2566. INFISH standards and guidelines "apply to all RHCAs and to projects and activities in areas outside RHCAs that are identified through NEPA analysis as potentially degrading RHCAs." AR 2568.
INFISH RM-1 requires the Forest Service to
[d]esign, construct, and operate recreation facilities, including trails and dispersed sites, in a manner that does not retard or prevent attainment of the [RMOs] and avoids adverse effects on *1243 inland native fish. Complete watershed analysis prior to construction of new recreation facilities inside [RHCAs] within priority watersheds.
AR 2571. "Watershed analysis" is a procedure for gathering critical baseline information on watershed function. AR 2637, 2683. To "retard" means to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system. AR 2565. "Adverse effects" include short-or long-term management-related impacts of an individual or cumulative nature, such as mortality, reduced growth, or other adverse physiological or behavioral changes. AR 2672.
There are nine watersheds, within which there are numerous subwatersheds, in the Project Area, with 138 miles of fish-bearing streams. AR 25365. INFISH RM-1 requires a watershed analysis for each of the nine watersheds within the Project area.
B. NFMA and NEPA Application
LandWatch argues that the Forest Service violated NEPA and the NFMA in concluding that the Project's impacts, additive to existing conditions, were not likely to affect Redband trout habitat. It argues that the Forest Service violated INFISH by not conducting an adequate watershed analysis in the Project area. It argues that the Forest Service failed to accurately assess current conditions in the watersheds because the Forest Service used historical data that was not current to describe steam conditions. Specifically, LandWatch argues that the agency lacked a rational basis for its conclusion because: (1) it did not properly account for baseline stream conditions, and (2) it did not consider cumulative sediment delivery.
1. Baseline Conditions
The Forest Service analyzed watersheds in the Project area and discussed direct and indirect effects for each alternative plan to create OHV trails. The chosen alternative proposes 15.2 miles of new construction plus opening closed/decommissioned roads within 300 feet of streams. AR 25444. The Forest Service included in the SFEIS stream surveys conducted in the Ochoco National Forest between 1999-2003 and 1989-2014. AR 25355. A Watershed Condition Framework including water quality, habitat access, and habitat elements was constructed and analyzed for streams within 300 feet of proposed trails. AR 25364-25401. Effects common to all the alternatives analyzed by the Forest Service were included. Sedimentation, water temperature, and large woody debris were discussed. AR 25403. While some short-term effects were recognized, the Forest Service concluded that none of the proposed alternatives would change any of the ratings for streams within 300 feet of trails. AR 25403.
LandWatch argues that the surveys do not accurately depict current stream conditions because key data is missing and the data is stale. Great Basin Res. Watch v. U.S. B.L.M. , 844 F.3d 1095, 1101 (9th Cir. 2016). Reliance on the data included in the SFEIS was not arbitrary or capricious. An agency need not measure actual baseline conditions in every situation. Id. Violations may occur if an agency has simply ignored existing data, Cent. Or. LandWatch v. Connaughton , 905 F.Supp.2d 1192, 1197 (D. Or. 2012), but that has not happened here. The Forest Service has included not only surveys, but conditions of watersheds and subwatersheds, such as stream temperatures which were monitored to determine average temperatures. AR 25357. It relied on other data to establish habitat baseline:
*1244 "research, relevant monitoring, field data, experience and professional judgment, as well as GIS information to provide the context, amount and duration of potential effects on aquatic resources from the [Project]." SR 25371.[14] In order to address the construction of trails on flow and sediment in streams, the existing conditions of road densities, drainage densities, and intermittent and perennial stream crossing densities were estimated and rated relative to one another for each analyzed subwatershed. AR 25362.[15] LandWatch has not shown that these surveying and monitoring data were likely incorrect. League of Wilderness Defs. v. Connaughton , 752 F.3d 755, 763 (9th Cir. 2014) ("[T]here was no reliable evidence that showed their results were incorrect ... so we cannot say that the USFWS and USFS' reliance on the surveys was arbitrary or capricious."). The Forest Service's analysis of baseline conditions in the Project Area is entitled to deference and does not violate NEPA. Earth Island Inst. , 697 F.3d at 1020.
2. Cumulative Sediment Delivery
LandWatch argues that the Forest Service violated NEPA because its assessment of cumulative effects on aquatic habitats failed to account for "important aspects of the problem," namely, grazing and unauthorized OHV use in the Project Area, both of which LandWatch argues cause significant degradation of aquatic resources. LandWatch argues that the Forest Service thus failed to take a "hard look" at sediment impact to aquatic habitat.
However, the Forest Service did consider OHV use in modeling sediment delivery from use of OHV routes, as compared to levels of background sediment. AR 25364, 25425. Also, the SFEIS addresses effects to watershed health-hydrology and aquatic species-specifically as to cumulative effects, including grazing activities. AR 25447-64. The SFEIS captured the effects of past grazing and unauthorized OHV use by using current environmental conditions as a proxy for the impacts of past actions. AR 25275-76. This satisfies the Forest Service's NEPA obligations in assessing sediment impacts. Cascadia Wildlands v. Bureau of Indian Affairs , 801 F.3d 1105, 1111 (9th Cir. 2015) ("An agency ... may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured.").
Additionally, the SFEIS determined that "cumulative effects from future and ongoing projects to [aquatic resources] are anticipated to be negligible." AR 25456, 25459. The SFEIS identified and described twenty-five "[f]uture and ongoing projects," and examined their cumulative effect on flow and sediment, sediment/turbidity, and aquatic species by quantitatively analyzing their effect on, among other things, road/trail densities and stream crossings. AR 25447-66.[16] In light of this analysis, as well as consideration of the cumulative effects of the other future and ongoing projects, the Forest Service determined *1245 that "there are no measurable increased cumulative effects beyond those effects described in the 'Direct and Indirect Effects' section relative to the flow and sediment regimes within the watersheds that overlap the [Project] area." AR 25459, 25460-64, 25456-57. This analysis provided the necessary "hard look" at the Project's potential environmental consequences, which permitted informed decisionmaking and public participation. The Forest Service fulfilled its NEPA obligations in this regard. The SFEIS provided a "useful analysis of the cumulative impacts of past, present and future projects" on aquatic resources. Muckleshoot Indian Tribe v. U.S. Forest Serv. , 177 F.3d 800, 810 (9th Cir. 1999) (quotation omitted).
3. Analysis of Lower Deep Creek Subwatershed
LandWatch argues that the Forest Service analysis was particularly flawed regarding the Lower Deep Creek subwatershed.[17] The Forest Service analyzed road densities for Lower Deep Creek as compared to other alternatives. AR 25445. Road densities were rated "high" within the 300 feet of Lower Deep Creek and included an addition of five stream crossings. Id. Conditions regarding water quality, flow, sediment, and turbidity in the subwatershed were rated "fair" to "poor." AR 25385. As indicated in the SFEIS and the Deep Creek Restoration Plan, a 2009 Forest Service document, the Deep Creek Watershed, including Lower Deep Creek, experienced declines in stream health and trout population. Some roads have been closed, which has helped to stabilize the watershed. AR 25385. Redband trout density in Lower Deep Creek declined from 1997 to 2003 but increased somewhat from 2006 to 2012. AR 25396. Stream conditions in Lower Deep Creek have fair to poor ratings, except for stream crossing and drainage density. AR 25399. The SFEIS points out that the Deep Creek Watershed Restoration Project was designed to "improve overall stream and riparian health and integrity within the watershed and to improve water quality and associated habitat suitable for use by redband trout and other aquatic life." AR 25449. Some of the objectives of the restoration project have been accomplished, including decommissioning of 4.3 miles of road in Lower Deep Creek. AR 25450.
In assessing baseline conditions for Lower Deep Creek, the Forest Service relied on the Deep Creek Restoration Plan data. AR 25385. See Great Basin Res. Watch , 844 F.3d at 1101. Past and present intervening forest management activities (wildfires, logging, grazing, etc.) may have impacted aquatic conditions and degraded aquatic habitat. Id. Nonetheless, the Forest Service's reliance on this data was not arbitrary or capricious. Gr. Basin Res. Watch , 844 F.3d at 1101 ("An agency need not conduct measurements of actual baseline conditions in every situation-it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method.").
Relying on this data regarding Lower Deep Creek, the Forest Service issued its general conclusion that the Project would have no measurable effect on Redband trout:
In response to specific comments, changes were made to [the Project] in *1246 order to avoid trails being located on roads planned for decommissioning as part of the Deep Creek Environmental Assessment, as well as to avoid specific areas of hydrologic concern. [The Project] avoids these areas of specific concern within the sediment delivery zone, resulting in a slight decrease in the overall road/trail densities within 300 feet of streams in the ... Lower Deep Creek ... Subwatersheds.
AR 25444. The Forest Service took the requisite "hard look" at the Lower Deep Creek subwatershed and the effects of the Project on Redband trout.
Federal defendants also argue that, contrary to LandWatch's contention, a watershed analysis specific to Lower Deep Creek was not required. Watershed analyses are required prior to construction of new recreation facilities "within priority watersheds." AR 2571 (RM-1). The SFEIS states that the Lower Deep Creek is a priority subwatershed, but that is specifically "as defined by the Forest Service Watershed Condition Framework Process." AR 25395. The Lower Deep Creek is not a priority watershed designated under INFISH to which the watershed analysis requirement necessarily applies. AR 2575, 25352-53. In any event, the Forest Service performed an adequate analysis of the Lower Deep Creek subwatershed.
C. INFISH Standards and Guidelines
1. Modification of RMOs and Consistency with INFISH Standards
Whether or not the Forest Service was required to do a watershed analysis, LandWatch argues that the Forest Service modified Riparian Management Objectives in violation of INFISH. Under INFISH, if the Forest Service does not complete a watershed analysis before modifying an RMO, the modification must be supported by "stream reach specific data," including "rationale supporting the change." AR 2564. The SFEIS states that "INFISH Riparian Management Objectives that will be discussed in this report relate to pools, temperature, large woody debris and bank stability." AR 25351. These RMOs would be indicators of effects to Redband trout habitat as a result of OHV proposals and, while not an RMO, sediment would also be discussed as an indicator of such effects. Id.
The Forest Service argues that it has provided sufficient justification for its modification of RMOs for large woody debris, stream temperature, and width/depth ratios. For the Project, the Forest Service argues it developed RMOs "describing good habitat ... to describe desired conditions for fish habitat," more exacting than INFISH standards, including for Redband trout habitat. AR 25351. See Great Old Broads for Wilderness v. Kimbell , 709 F.3d 836, 851 (9th Cir. 2013) (holding that the court must defer to Forest Service's interpretation of INFISH standards "unless it is plainly erroneous or inconsistent with the standard").
The Forest Service analyzed habitat indicators, and specific criteria were used to determine how well each indicator functioned in the watersheds. AR 25355-64. These indicators are water quality, including stream temperature and sediment/turbidity; habitat access, including physical barriers to fish passage; and habitat elements, including large woody material, pool frequency and quality, and channel width/depth ratios. Each indicator described a properly functioning standard (good), a functioning at risk standard (fair), and a not properly functioning standard (poor). Id. Watersheds and subwatersheds within the Project Area containing streams within 300 feet of proposed trails *1247 were analyzed, including Deep Creek and Lower Deep Creek.
The Forest Service analyzed the RMOs for stream temperature based on references concerning the size of, and average temperatures of, streams where Redband trout are typically found, and the average maximum temperatures suitable for spawning. AR 25355-57. It considered the width/depth ratio RMO by adopting the more nuanced Rosgen (1996) stream system. AR 25356-61; SR 942. These studies provided specific data for the Forest Service, applying its expertise, to modify the RMOs, under the deferential standard. See Lands Council v. McNair , 537 F.3d at 994 (holding that the Forest Service does not act arbitrarily or capriciously where it "support[s] its conclusions that a project meets the requirements of the NFMA and relevant Forest Plan with studies that the agency, in its expertise, deems reliable").
2. Retardation or Prevention of Attainment of RMOs
INFISH requires that trail design, construction, and operation be done "in a manner that does not retard or prevent attainment of the [RMOs] and avoids adverse effects on inland native fish." AR 2571 (RM-1). For site-specific projects, the Forest Service must apply RMOs through a "thorough analysis" of whether the project will retard the near natural rate of recovery. AR 2565. Here, the Forest Service concluded that the Project is "within INFISH requirements and direction," and that "all action alternatives would neither retard nor prevent attainment of the [RMOs], as long as the appropriate Project Design Criteria are followed during construction and long-term maintenance." AR 25466.
LandWatch argues that these are summary conclusions, and lack sufficient analysis, data, and explanation, specifically regarding how the Project is consistent with INFISH. It argues that, although the SFEIS admits short-term impacts from Project construction, see, e.g. , AR 25446, 25469, the SFEIS and ROD do not explain how these impacts would neither retard nor prevent RMO attainment. LandWatch also argues that the Forest Service has not explained how long-term impacts from the Project would be consistent with INFISH. It argues that the Forest Service's claim that the Project would be more beneficial in the long-term as compared to unregulated travel in the Project Area does not establish INFISH consistency.
The SFEIS examined the Project's effects on RMOs, including stream temperature, large woody debris, and width-depth ratios, and concluded that there would be little to no effect. AR 25402-03. While acknowledging that construction activity would have short-term effects, the Forest Service found that the Project, by incorporating project design criteria and best management practices, would minimize sediment delivery, and, because little riparian vegetation would be removed, would have no effect on stream temperatures. Id. Likewise, because design criteria prevent removal of shade trees, there would be no reduction of shade, and no increase in stream temperatures. Id. The Forest Service found that the Project would have "very limited" effects on large woody debris; although some would be removed at stream crossings, the material would be moved up-or downstream to maintain debris numbers. Id. The Forest Service found that the Project would have "very limited" effects on width/depth ratios. AR 25403. Stream crossings would be designed to meet the ratios, removal of bank-stabilizing vegetation would be minimal, and the Project would contribute insignificant sediment. Id.
In addition, the Forest Service summarized the effects of the chosen alternative *1248 regarding flow sediment, stream crossing density, turbidity, road/trail density, and sediment loading by comparing the chosen alternative to other proposals. SR 25439-47. The Forest Service concluded that the Project "would have no measurable effect on Redband trout ... in all project subwatersheds." AR25446. These conclusions are supported by sufficient reasoning and analysis, and were not arbitrary or capricious. Contrary to LandWatch's arguments, the Forest Service did not fail to explain how impacts to aquatic habitats would not retard or prevent RMO attainment. See League of Wilderness Defs. v. U.S. Forest Serv. , 445 F.Supp.2d 1186, 1199 (D. Or. 2006) (finding no INFISH violation where the "administrative record does not clearly show that there will be significant negative impacts to Redband trout"), rev'd in part on other grounds , 549 F.3d 1211 (9th Cir. 2008). The Forest Plan requires that the Forest Service consider how the Project will affect riparian habitats and this was done, especially with regard to long-term effects. There was no violation of INFISH standards.
As to the riparian claims, including regarding Redband trout, INFISH, baseline conditions, sediment delivery, and RMOs, defendant's Motion for Summary Judgment should be granted, and LandWatch's and Guardians' Motions should be denied.
VI. Travel Management Rule Claims
Guardians argue that the Project fails to comply with the Travel Management Rule's ("TMR") minimization criteria as to the designation and location of routes within the Project.
A. Executive Order 11644 and the Travel Management Rule
Executive Order 11644 directs "agencies to promulgate regulations that require that all 'areas and trails' allowing off-road vehicles ('ORVs') on public lands be located in areas that"
(1) ... minimize damage to soil, watershed, vegetation, or other resources of the public lands[;]
(2) ... minimize harassment of wildlife or significant disruption of wildlife habitats[; and,]
(3) ... minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.
WildEarth Guardians v. Mont. Snowmobile Ass'n , 790 F.3d 920, 929 (9th Cir. 2015) (footnote omitted) (quoting Exec. Order 11644 §§ 3(1)-(3) ("Use of Off-Road Vehicles on the Public Lands") (Feb. 8, 1972) ). The TMR, 36 C.F.R. Part 212, was promulgated in 2005 "to improve implementation of the executive orders and establish a national system of roads, trails, and areas with restricted ORV use." Mont. Snowmobile Ass'n , 790 F.3d at 929. It requires National Forests to specify routes, vehicle types, and seasons of motorized travel on roads, trails, and other areas. 36 C.F.R. §§ 212.50(a), 212.51(a). It prohibits motor vehicle use off designated roads and trails and outside designated areas. Id. §§ 212.50(a), 261.13.
In designating roads, trails, and areas, the Forest Service must
consider effects on National Forest System natural and cultural resources, public safety, provision of recreational opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the availability *1249 of resources for that maintenance and administration.
Id. § 212.55(a). The Forest Service must also
consider effects on the following, with the objective of minimizing:
(1) Damage to soil, watershed, vegetation, and other forest resources;
(2) Harassment of wildlife and significant disruption of wildlife habitats;
(3) Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands; and
(4) Conflicts among different classes of motor vehicle uses of National Forest System lands or neighboring Federal lands.
In addition, the responsible official shall consider:
(5) Compatibility of motor vehicle use with existing conditions in populated areas, taking into account sound, emissions, and other factors.
Id. § 212.55(b). These are known as the "minimization criteria." Mont. Snowmobile Ass'n , 790 F.3d at 930. "[T]he TMR requires the Forest Service to apply the minimization criteria to each area it designated for" OHV use. Id. "[T]he Forest Service must provide a more granular minimization analysis to fulfill the objectives of" the TMR." Id. at 931. "What is required is that the Forest Service document how it evaluated and applied the" TMR analysis "on an area-by-area basis with the objective of minimizing impacts as specified in the TMR." Id. "[M]ere consideration of the TMR's minimization criteria is not sufficient to comply with the regulation." Id. at 932. "Rather, the Forest Service must apply the data it has compiled to show how it designed the areas open to [OHV] use with the objective of minimizing damage to" various forest resources. Id. (quotation omitted). "The TMR is concerned with the effects of each particularized area and trail designation. " Id. (emphasis added).
B. Application of the Travel Management Rule
The SFEIS fails to demonstrate application of the TMR minimization criteria, with regard to minimizing effects on forest resources and conflicts among motor vehicle use and existing recreational use, specifically, as to how trail routes were designated, i.e., located. How the routes comply with the minimization criteria, specifically as to how they are located and designated to minimize these effects, is not explained. The Forest Service did not properly analyze how trail designation would minimize impacts to special landscapes, such as scablands and old growth management areas, and to wildlife and wildlife habitats, particularly with regard to elk calving sites and wallows. It also failed to sufficiently analyze how trail designation would minimize conflict among other users of roads and trails, such as equestrians and hikers. The Forest Services' analysis of water quality, particularly with regard to sediment and stream crossings, adequately meets INFISH standard, but falls short of the minimization standard required by the TMR.[18]
*1250 Defendants argue that they extensively considered the objective of minimizing impact to forest resources, citing Chapter 3, Part 212 ("Travel Management"), Subpart B of the SFEIS, "Designation of Roads, Trails, and Areas for Motor Vehicle Use." AR 25676-80. However, this portion of the SFEIS contains only a brief and cursory discussion with only general statements about attempts to comply with the minimization criteria. This fails to demonstrate, at the "granular" area-and trail-level, how routes were designated or located, how the minimization criteria were evaluated and implemented, how data was applied, or how impacts were minimized. Cf. Mont. Snowmobile Ass'n , 790 F.3d at 930-32. At best, this discussion amounts to mere "consideration" of the minimization criteria and TMR, which is insufficient. Id. at 932.
Defendants argue that the final project alternative was chosen from proposed alternatives on the basis that it was the environmentally preferable alternative under NEPA, and that the chosen alternative would cause less impact than the others. But purported compliance with NEPA, and an argument that the chosen proposal was superior to other alternatives, does not address the TMR requirement that the SFEIS properly analyze and apply the minimization criteria, as to designation of motor vehicle routes, and demonstrate how the relevant impacts were minimized, especially with regard to the impacts on the gray wolf and elk. Defendants cite Pryors Coalition v. Weldon , 551 F. App'x 426 (9th Cir. 2014), to argue that their consideration of the minimization criteria was sufficient. The EIS in Pryors Coalition reflected "voluminous records" where "numerous alternative plans for route designations" were considered, and the chosen alternative was modified in numerous ways as to specific route designations and individual environmental resources, with certain resource impacts targeted. Id. at 429-30. In that case, "site-specific locations" were analyzed, id. at 432, unlike here, where the SFEIS falls short of the degree of analysis and level of specificity.[19]
Defendants attempt to rely on project design features of the Project, as well as the SFEIS environmental analysis, to show compliance with the TMR. Defendants argue that minimization of effects occur in the analysis of the environmental impacts of the Project. However, this is not the same as an analysis and application of how the Forest Service sought to minimize such impacts with regard to the designation of routes. Education, enforcement, increased compliance, maintenance, and monitoring may all serve to reduce impacts, but this does not meet the TMR's requirement to show application of the criteria to minimize impacts when locating routes. The degree of deference to be afforded an agency in its administrative decisionmaking process and its application of *1251 its own expertise does not extend so far as to allow an agency to fail to comply with a specific, substantive mandate by reference to a distinct, nonresponsive analysis.
The SFEIS and ROD thus fail to comply with the TMR and the minimization criteria. Guardians' Motion for Summary Judgment should be granted, and defendant's Motion denied.
VII. Remedy
The APA "requires federal courts to set aside federal agency action that is 'not in accordance with law.' " F.C.C. v. NextWave Pers. Commc'ns Inc. , 537 U.S. 293, 300, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003) (quoting 5 U.S.C. § 706(2)(A) ). "If the decision of the agency is not sustainable on the administrative record made, then the decision must be vacated and the matter remanded for further consideration." Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp. , 423 U.S. 326, 331, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976) (quotation omitted). "Under the APA, the normal remedy for an unlawful agency action is to set aside the action. In other words, a court should vacate the agency's action and remand to the agency ...." Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs , 486 F.3d 638, 654 (9th Cir. 2007), rev'd on other grounds , 557 U.S. 261, 129 S.Ct. 2458, 174 L.Ed.2d 193 (2009).
The Court finds no reason to depart from the standard remedy of vacatur in this case. "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." Cal. Cmtys. Against Toxics v. U.S. E.P.A. , 688 F.3d 989, 992 (9th Cir. 2012). Here, the Forest Service committed multiple substantive errors, as to multiple statutes, regulations, and rules. For the Forest Service to proceed with the Project without reconsideration of the SFEIS and ROD has the potential to affect multiple environmental resources, including sensitive elk habitat, and could impact the endangered gray wolf, absent consideration of whether formal Section 7 consultation is required. On the other hand, for the Forest Service to delay construction of recreational vehicle trails poses little risk of disruptive consequences or costly delay.
The Court may order remand without vacatur only "limited circumstances," Cal. Cmtys. Against Toxics , 688 F.3d at 994, which the Court finds do not apply here. Accordingly, the Court should VACATE the SFEIS and ROD and REMAND to the Forest Service for further proceedings consistent with these Findings and Recommendations.[20]
RECOMMENDATIONS
For these reasons, the Court should GRANT IN PART AND DENY IN PART the parties' Motions for Summary Judgment, *1252 as stated above. (Docket Nos. 48, 57, 58, 69). The Court should VACATE the Forest Service's decision and REMAND for further proceedings consistent with these Findings and Recommendations.
SCHEDULING ORDER
The above Findings and Recommendations will be referred to a United States District Judge for review. Objections, if any, are due September 10, 2018. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendations will go under advisement on that date.
IT IS SO ORDERED.
DATED this 27th day of August, 2018.

A District of Idaho decision explained that although the RMOs were considered interim in 1995, they "continue to apply[.]" W. Watersheds Project v. United States Forest Serv. , No. 1:15-CV-00218-REB, 2017 WL 4927660, at *5 (D. Idaho Oct. 31, 2017), appeal filed , No. 17-36042 (9th Cir. Dec. 27, 2017).

Substituted as defendant for former Forest Supervisor Stacey Forson.

Likewise, amicus attempts to bring its own causes of action in its pleadings, in addition to and independent of the parties' claims. This too is improper. (Just as was amicus' unpermitted Reply brief. (Docket No. 76) ). The role of amicus' briefing is to inform the Court and provide perspective on the issues the parties themselves raise; it is not to act like a plaintiff and bring additional causes of action. Therefore, the Court does not consider amicus' putative claims to be properly before the Court. Nonetheless, the Court has used amicus' briefing for its proper purpose, that is, informing its analysis of the parties' claims and arguments.

Amicus also suggests that the map may be considered as a mere "explanatory aid that visually demonstrates data and information already in the record." Amicus Mot. Submit Extra-Record Evid., at 3 (Docket No. 55). To the extent amicus seeks to use the map as simply a visual aid or illustration-but not have it considered as evidence or admitted to the record-it may do so without filing a motion.

"Gray wolves avoid areas with motorized vehicle activity. Gray wolves avoid areas with concentrated human activity," Am. Compl. ¶ 58 (Docket No. 24); "Road and ORV routes can effect wolves by reducing their available prey, such as elk and deer, and decreasing suitability of denning, foraging and dispersal habitat," Am. Comp. ¶ 105 (Docket No. 23).

Wallows are holes that bull elk dig into the ground, where they urinate to deploy scent and roll around in, to alert other elk to their presence.

Rutting season is mating season.

Using the Forest Service's figure of total Project Area at 471.14 square miles, AR 25518, 1.83 mi/mi[2] of road density means 862 miles of road (471.14 x 1.83).

This assumes closure of all operational maintenance level 1 roads. AR 25283.

(1,069 miles + 107 miles) / 471.14 miles square.

(1,069 miles of existing open roads + 700 miles of user-created roads) / 471.14 mi[2] of Project Area. This is before considering the 107 miles added by the Project.

Hunters also argue broadly that the Forest Service did not consider the impacts of continued use from trails it considered closed regarding elk security habitat. However, the Forest Service acknowledged that closed roads may continue to have unauthorized OHV use and that this could impact wildlife security habitat. AR 25472, 25519. The SFEIS also explained that active enforcement of trail closures would increase, that trails would be rehabilitated and restored, and that closed and unauthorized trails would be marked and discouraged or prohibited. AR 25255, 25475, 28782, 28785. This suffices to satisfy the Forest Service's obligation to consider impacts of continued use of closed roads.

Plaintiffs' arguments regarding displacement of elk onto private land are ultimately variations on these critiques of the cited scientific studies, and for the same reasons are unsuccessful.

The Forest Service may have an obligation to consider connectivity of elk security habitat, as plaintiff argues. This may factor into road density analysis as it pertains to user-created roads and closed roads, but such a consideration would be difficult to consider without a clear picture of the impact of all roads on elk security habitat.

See also AR 25371, 25414, 25374, 25377-78, 25386-87.

Guardians contend that road densities were not considered by the Forest Service, contrary to NFMA. However, road densities were a part of the Forest Service's analysis regarding baseline conditions and sediment issues.

The SFEIS also noted that management of grazing in the Project Area had improved and that "[a]ctive rehabilitation of user-created trails would make them less usable to cattle." AR 25456.

Federal defendants argue that LandWatch waived any argument regarding INFISH consistency and a watershed analysis of Lower Deep Creek by not raising this specific objection during the administrative process. However, LandWatch registered objections regarding INFISH criteria, modification of RMOs, and Lower Deep Creek. AR 26790-91. This is sufficient notice to the agency. Lands Council v. McNair , 629 F.3d at 1076.

The Forest Service TMR analysis fails to consider route selection regarding the 17.3 miles of new routes within 300 feet of streams, including 12.4 miles within RHCAs, and 183 stream crossings. AR25273, 25443-45. The Forest Service acknowledged the detrimental effects of such routes on riparian areas. See AR 25273, 25341, 25440-46, 27030. During the administrative process, Guardians submitted scientific studies regarding recommendations for minimizing such effects. See, e.g. , AR 27020-21, 27053-65.

With regard to route designation, Guardians also argue that defendants violated NEPA by not providing adequate baseline data regarding Project routes through scablands. Although Guardians' arguments repeat broad calls for "accurate" and "relevant" baseline data, the only specific datum Guardians call for is regarding whether routes through scablands would be on open system roads, closed roads, or non-system roads. Guardians otherwise do not indicate how the Forest Service's provision of data regarding routes through scablands was deficient. In any event, the SFEIS provided the total number of trail miles through scabland areas under each action alternative that would be on newly constructed trails (new disturbance), on closed or decommissioned roads (existing disturbance), and on open roads. AR 25592. The ROD includes maps showing the routes through scablands on decommissioned or closed roads, on open roads, and on new trails. AR 28721-22. The Forest Service discussed the effects of the Project and how it minimize such effects.

Defendants argue that the parties previously agreed that the question of remedies would be subject to additional briefing, were the Court to find agency error, and that the Court determined that it would receive additional briefing on remedies; defendants cite to the December 8, 2017 Scheduling Conference transcript. See Sched. Conf. Tr. (Docket No. 82); Fed. Defs. Reply, Ex. 1 (Docket No. 83-1). However, careful reading of the transcript shows that, while the Court did entertain whether to separately address the question of remedies, and whether that would be subject to separate briefing, the Court did not make a determination on this question, did not formally order as such, did not bifurcate the case, and so forth. See Tr. 35-36. Further, the Court finds that this matter has received more than sufficient briefing and that further briefing is not called for. The Court finds that it may properly consider, and issue a recommendation on, the question of remedies based on the briefing and record presently before the Court.